Connolly, Thomas E., J.
The Plaintiff, Massachusetts Bay Transportation Authority, has moved to vacate an award, issued on July 12,2005 by arbitrator Tammy Biynie, Esq., and to stay further proceedings in said matter. Specifically, the MBTA argues that the arbitrator’s award which modified the MBTA’s decision to demote William Fleming from his position as a lieutenant with the MBTA Police Department violates G.L.c. 150C, §11(a)(3). Further, the MBTA argues that it violates public policy because it requires the reinstatement to a command position of an individual whose conduct violated the rules and regulation of the MBTA Police Department, undermined the good order of the Department, and undermined the Department’s efforts to restore public confidence in the MBTA police. The Defendant, MBTA Superior Officers Association, has moved for judgment on the pleadings. For the reasons stated below, the MBTA Superior Officers Association’s Motion for Judgment on the Pleadings is GRANTED and the MBTA’s Motion for Judgment on the Pleadings is DENIED.

BACKGROUND AND FACTS

This matter came on for hearing on Cross Motions for Judgment on the Pleadings pursuant to Mass.RCiv.P. 12(c), upon an arbitrator’s decision and award under a mandatory arbitration provision of a labor contract in effect at all relevant times.
In substance, the facts are fairly simple. Lieutenant William Fleming (“Fleming”) is a long-time employee of the MBTA police. Fleming, while on leave of absence from his employment due to an injury, engaged in a conversation with a subordinate officer (“MacKay’j over a recorded line during which Fleming and McKay spoke about a number of recent events, including the recent murder of a youth in the MBTA’s Dudley Square station and the current relations between the new Chief of Police and the unions. In that conversation, Fleming made statements that could be construed as indiscreet and inappropriate. One comment made by Fleming was that it was “better to be a racist than a chicken ... At least racist carries the connotation you can fight.” The arbitrator found such comments to be “indiscreet. . . inappropriate and insensitive.”
As noted above, there had been an incident in early 2004 when a young man was attacked and killed in the MBTA’s Dudley Square station. The homicide was heavily covered in the media and some articles or reports were critical of the MBTA police. Some reports claimed that the MBTA Police had not been sufficiently aggressive in patrolling the Dudley Square area. After said killing, the new Chief of the MBTA Police, Joseph Carter (“Chief Carter”), was quoted in a Boston Globe article that new policing systems might have made a difference, but that the proposed changes had not yet been implemented due to labor issues within the Department. Chief Carter maintained that the Boston Globe article was inaccurate, the article did not in fact represent his view, and “that the categorization of this issue as a union problem is not only egregiously false, but also a colossal disservice to the community.” Both Chief Carter and Lt. Fleming were in the immediate past competitors for the new Chiefs position, and Lt. Fleming had recently been disciplined, resulting in his being demoted from Deputy Chief to his civil service rank of Lieutenant.
*214 The statement attributed to Lt. Fleming might be interpreted in different ways. Many times, an urban police department might increase its presence and surveillance in an area because of recent violent crimes. There will also be times when some members of the public will complain about increased presence and surveillance and will claim that the police are just targeting the teenagers, for instance in Dudley Square Station, because of racism and racial profiling. When the police back off from a location because of that criticism, they are then criticized for not having a strong enough presence to prevent violent crimes. The police are then put in the position of “dammed if you do, dammed if you don’t.” Considering Lt. Fleming’s statement that “it is better to be a racist than a chicken ... At least racist carries the connotation you can fight,” could be interpreted as Fleming’s preference that the MBTA should continue to be aggressive and take the chance of being called a racist, rather than back off and do little about the on-going crime. This Court fully acknowledges that the statement could be interpreted in other ways, including a racist connotation, but the Court points this out to illustrate that Lt. Fleming’s comments may be construed and interpreted with different meanings.
The arbitrator dismissed all other claims.
Chief Carter, after reviewing the tapes and transcripts, detailed Fleming’s conversation with MacKay. On April 16, 2004, a Notice of Hearing was issued. After the hearing, the designated hearing officer concluded that just cause existed to impose disciplinary action. Chief Carter issued a disciplinary letter on August 19, 2004 and reduced Lt. Fleming in rank from “Lieutenant to Police Officer.”[1]
Thereupon, Fleming and the MBTA police Superior Officers Association filed a grievance and the matter came on for hearing in arbitration at the American Arbitration Association before Arbitrator Tammy Brynie. After hearing, Arbitrator Brynie issued a twenty-page Decision and Award finding, inter alia, that Fleming was deserving of some discipline for the remark concerning racism, which she found to be an insensitive and inappropriate remark. The arbitrator found that demoting Fleming two ranks was excessive and an over-reaction to his misconduct. The arbitrator found that the demotion of Fleming was not for just cause, and ordered that Fleming be “reinstated as Lieutenant, and be made whole for lost pay and benefits resulting from his demotion, less tweniy days pay in connection with the supervision imposed pursuant to this award.”
Specifically, the arbitrator did not find that Fleming’s comments constituted harassment or a violation of the Department’s EEO policy. Nor was the arbitrator convinced that Fleming’s remarks “undermined the integrity of the Department, impaired its mission, promoted disharmony or otherwise affected morale.” Also, the arbitrator was not convinced that, “by conversing with MacKay in an indiscreet manner, the Grievant substantially violated of [sic] his obligations as an officer of rank within the Department.” Further, the arbitrator was not convinced that the bulk of the Grievant’s conversation amounted to conduct unbecoming of an officer.
The MBTA timely filed this civil action seeking to vacate the award and to stay further proceedings on said matter. The MBTA alleges that the arbitrator’s decision violated G.L.c. 150c, §11 and violates public policy.

DISCUSSION

The MBTA argues that the arbitrator exceeded her authority by issuing an award that violates G.L.c. 150C, §ll(a) and public policy because the award provides for the reinstatement to supervisory rank of an officer who engaged in conduct with a subordinate that appeared to condone racism, and which were [sic] in clear conflict with the reform efforts the Department was then engaged in. Specifically, the MBTA argues that Fleming’s actions violated the well defined and prominent public policy that condemns the perception of racism in policing; that supervision of line officers is integral to the duties of a high ranking officer; and that Fleming’s conduct is such that dismissal from the command rank is required.
Courts are generally permitted a very narrow scope of review and inquiry into an arbitration award, and are only to determine if the arbitrator has exceeded the scope of his authority, or decided the matter based on fraud, arbitrary conduct, or procedural irregularity in the hearings. Massachusetts Highway Dep’t v. American Fed’n of State, County & Mun. Employees, 93, 420 Mass. 13, 15 (1995), citing Plymouth-Carver Regional Sch. Dist. v. Farmer & Co., 407 Mass. 1006, 1007 (1990). Courts are reluctant to overturn arbitration awards, especially when the parties have chosen to arbitrate, because of the strong public policy favoring arbitration, and courts’ deference to arbitration awards are more pronounced where arbitration forms part of a collective bargaining agreement. Boston v. Boston Police Patrolmen’s Association, (“DiSciullo”) 443 Mass. 813, 817 (2005). Courts are strictly bound by an arbitrator’s findings and legal conclusions, even if they appear erroneous, inconsistent, or unsupported by the record at the arbitration hearing. City of Lynn v. Thompson, 435 Mass. 54, 61 (2001). Courts are even bound by an arbitrator’s findings and conclusions which are believed to be grossly erroneous. Id. at 62. “An arbitrator’s result may be wrong; it may appear unsupported; it may appear poorly reasoned; it may appear foolish. Yet, it may not be subject to court interference.” City of Lynn, 435 Mass. at 62, citing Delta Air Lines, Inc. v. Air Line Pilots Ass’n. Int'l, 861 F.2d 665, 670 (11th Cir. 1988).
Here, the Court is bound by the arbitrator’s findings and conclusions, regardless of its own personal beliefs. These findings include the arbitrator’s conclu *215 sion that Fleming’s statement, “better to be a racist than a chicken ... At least racist carries the connotation you can fight,” was insensitive and inappropriate and deserving of some discipline. The arbitrator felt that demoting Fleming two ranks was excessive and an over-reaction to his misconduct. The arbitrator also found that the demotion of Fleming was not for just cause, and ordered that Fleming be “reinstated as Lieutenant, and be made whole for lost pay and benefits resulting from his demotion, less twenty days pay in connection with the supervision imposed pursuant to this award.” We must accept these conclusions for the purposes of our analysis. City of Lynn, 435 Mass. at 62.
The MBTA seeks to set aside this arbitration award on the ground that the arbitrator exceeded her authority by issuing a decision which violates public policy. See Massachusetts Highway Dep’t v. American Fed’n of State, County & Mun. Employees, Council 93, 420 Mass. 13, 16-19 (1995) (awards that violate public policy are outside the scope of an arbitrator and must be vacated). The question of public policy is ultimately one for resolution by the courts, not arbitrators, and courts employ a stringent, three-part analysis in determining whether the narrow public policy exemption requires the arbitrator’s award to be vacated. DiSciullo, 443 Mass. at 818.
First, the public policy in question must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of public interests. Second, the public policy exemption does not address disfavored conduct in the abstract, but [only] disfavored conduct which is integral to the performance of employment duties. Finally, courts require a showing that the arbitrator’s award reinstating the employee violated public policy to such an extent that the employee’s conduct would have required dismissal.
DiSciullo, at 818-19 (internal citations omitted).
First, the MBTA argues that there is a well-defined and prominent public policy that condemns the perception of racism in policing. As evidence of such, the MBTA notes that the Legislature and the courts have both taken actions to eliminate the use of racial profiling by police officers in the performance of their official duties.[2] The MBTA police had been criticized by members of the public for its increased presence and surveillance, who claimed that the police were just targeting teenagers because of racism and racial profiling. Even though Fleming was not reprimanded for racial profiling, his insensitive comment goes right to this very issue. Although Fleming’s statement could be interpreted in different ways, it can also be interpreted as violating the well-defined and prominent public policy that condemns the perception of racism in policing. Therefore, the first prong is satisfied.
Secondly, the MBTA argues that Fleming’s comments violate public policy because supervision of line officers is integral to the duties of a high ranking officer. Where the person performs his employment duties and, in doing so, violates standards, restraints and restrictions on conduct, clearly and explicitly established by the people in their laws, a requirement that the employer suffer that malperformance and not discharge the offender does itself violate . . . public policy." (Emphasis in original.) Massachusetts Highway Dep’t, 420 Mass. at 17. Arbitration awards reinstating discharged employees are thus not upheld if the public policy relates to the worker’s employment and the “offense [goes] to the heart of the worker’s responsibilities.” Id.
In Massachusetts Highway Dep’t, the SJC found that public policy was not violated by an arbitration award reinstating an employee who was found to have a pistol with obliterated serial numbers in his workplace toolbox, conduct which specifically violated two of Massachusetts’s gun control laws. 420 Mass, at 20. The court found that while the grievant may have violated criminal statutes and the policies the statutes ’ embody, the arbitration award reinstating him did not. Id. The grievant’s conduct was wrong in itself; his employment did not make it any more so. His possession of the gun at work did not go to the heart of his employment duties. Id.
Also, in DiScuillo, the Court vacated an arbitrator’s award to reinstate a police officer who made false arrests and filed false charges because it was against public policy. DiScuillo, 443 Mass. at 821. The court found that Disciullo’s misconduct could not have been committed but for the authority vested in him as a police officer, and therefore, his actions went right to the heart of his responsibilities. Id. The court reasoned that the Legislature had forbidden persons found to have engaged in such conduct from becoming officers, and by implication, from remaining police officers. Id. at 821. Therefore, the award reinstating the police officer was contrary to public policy. Id.
Although the MBTA correctly states that the arbitrator found that Fleming’s actions violated the loyalty and integrity standards of conduct expected of a ranking officer, the MBTA did not include her other important findings. Specifically, the arbitrator did not find that Fleming’s comments constituted harassment or a violation of the Department’s EEO policy. Further, the arbitrator was “not convinced that Fleming’s remarks undermined the integrity of the Department, impaired its mission, promoted disharmony or otherwise affected morale.” Most importantly, the arbitrator was not convinced that “by conversing with MacKay in an indiscreet manner, the Grievant substantially violated of [sic] his obligations as an officer of rank within the Department. Therefore, I am not convinced that the bulk of the Grievant’s conversation amounted to conduct unbecoming of an officer." For these rea *216 sons, Fleming’s statement did not violate public policy because it is not integral to the performance of his duties. Therefore, the second prong is not satisfied.[3]
Finally, the MBTA argues that Fleming’s conduct is such that dismissal from the command rank is required because as a superior officer, his responsibilities included adherence to the standards of conduct established by the Chief of the MBTA Police Department. To prevail, the MBTA must demonstrate that public policy requires that Fleming’s conduct, as found by the arbitrator, is grounds for dismissal, and that the lesser sanction would frustrate public policy. DiSciullo, 443 Mass, at 819. The question to be answered is not whether Fleming’s conduct itself violates public policy, but whether the agreement to reinstate him does. Id. If an award is permissible, even if not optimal for the furtherance of public policy goals, it must be upheld. Id.
In City of Lynn, the SJC found that the arbitrator’s award reinstating a police officer who broke a mentally unstable person’s arm and had a history of charges of excessive force was not against public policy. 435 Mass, at 63. The Court reasoned that the arbitrator only found that the officer engaged in “conduct unbecoming an officer,” not excessive force. Id. The SJC was bound by the arbitrator’s findings and conclusions, no matter the extent to which the Court believed they were “grossly erroneous.” Id. at 62. The SJC could not ignore, and had to apply, the arbitrator’s findings even though they appeared unsound, poorly reasoned, or otherwise flawed. Id. at 64. Therefore, the Court concluded that the arbitrator’s decision to reinstate an officer who was only found to have engaged in conduct unbecoming an officer did not violate public policy. Id. at 65.
There are “rare instances” where the arbitrator’s award must be vacated as contrary to “an explicit, well-defined, and dominant public policy.” DiSciullo, 443 Mass. at 813. In DiScuiUo, the SJC overturned an arbitrator’s award reinstating a police officer where the officer engaged in knowingly untrue, egregious, outrageous, and felonious misconduct. Id., supra. Specifically, the arbitrator found that the officer used his position to falsely arrest two individuals on misdemeanor and felony charges, lied in sworn testimony and over a period of two years about his official conduct, and knowingly and intentionally squandered the resources of the criminal justice system on false pretexts. Id. at 819. Based on the arbitrator’s determinations, the SJC found that DiSciullo’s continued employment as a police officer would frustrate strong public policy against the kind of egregious dishonesty and abuse of official position in which he was proven to have engaged, and vacated the arbitrator’s award. Id. at 814.
Here, the arbitrator found that Fleming’s remarks were “indiscreet . . . inappropriate and insensitive.” However, they did not: constitute harassment or a violation of the Department’s EEO policy; undermine the integrity of the Department, impair its mission, promote disharmony or otherwise affect morale; substantially violate his obligations as an officer of rank within the Department; or amount to conduct unbecoming of an officer.
This court is bound by the arbitrator’s findings for purposes of its analysis, regardless of its own beliefs and conclusions. City of Lynn, 435 Mass. at 62. Specifically, the court accepts that Fleming’s remark was insensitive, but did not amount to conduct unbecoming an officer. In City of Lynn, the court concluded that an officer’s reinstatement to the police force did not violate public policy because the arbitrator merely concluded that the officer was guilty of conduct unbecoming an officer. Id. at 63. Here, the arbitrator concluded that Fleming’s remark did not even amount to conduct unbecoming of an officer. Based on the arbitrator’s findings, Fleming’s reinstatement to the rank of lieutenant did not violate an explicit, well-defined, and dominant public policy. See Id. at 63. Therefore, his conduct is not such that dismissal from command is required.
Unlike DiSciullo, this is not one of the “rare instances” where reinstating Fleming frustrates public policy. Fleming’s behavior, and the arbitrator’s findings, did not reach the level where the court had a legitimate basis to vacate the arbitrator’s award due to public policy. See DiSciullo, 443 Mass. at 814. Therefore, the arbitrator’s award reinstating Fleming to the rank of Lieutenant stands.
Although the MBTA alleged that Fleming’s reinstatement to the rank of lieutenant violated public policy, the arbitrator’s findings do not provide a factual determination on which to base this public policy exception. There being no basis on which to set aside this determination, there is no basis for invoking the public policy exception, and thus no basis on which the court will set aside this particular arbitration award. See City of Lynn, 435 Mass. at 65. Therefore, the MBTA Superior Officers Association’s motion for Judgment on the Pleadings is GRANTED and the MBTA’s motion for Judgment on the Pleadings is DENIED.

ORDER

For the reasons stated above, it is hereby ORDERED that the Defendant’s Motion for Judgment on the Pleadings is GRANTED and the Plaintiffs Motion for Judgment on the Pleadings is DENIED.

 Lt. Fleming was previously a Deputy Superintendent under the previous Chief, Chief O’Laughlin. On Chief O’Laughlin’s retirement, Fleming served as the Acting Chief of the Department. Fleming and Carter were both candidates for the Chiefs position. After a selection process. Carter, who was Chief of Police in Oak Bluffs, MA, was hired as the MBTA Chief. Carter, in a prior disciplinary matter, faced months before August 19, 2004, had reduced Fleming from a Deputy Superintendent to his civil service rank of Lieutenant.

 The Massachusetts Legislature enacted Chapter 228 of the Acts of 2000, mandating the collection and analysis of traffic stop data, in an effort to ensure that adequate efforts are being made to identify and eliminate any instances of racial and gender profiling by police officers in the performance of their official duties. Racial profiling violates art. 14 of the Massachusetts Constitution. Commonwealth v. Gonsalves, 429 Mass. 658, 670 (1999).

 The fact that Fleming was out on injury leave when he made the remarks to his subordinate MacKay does not excuse his behavior. Officers are subject to the same rules and regulations whether off or on duty. Boston v. Boston Patrolmen’s Assn., 8 Mass.App.Ct, 220, 221 n.1. (1979), citing Broderick v. Police Commr. of Boston, 368 Mass 33, 34 n.1. (1975).